Good afternoon, your honors. Oh, before we do that, we have Judge Gould by video. Can you hear us, Judge Gould? Yes, I can, Judge Rawlinson, and good afternoon to you, Judge Tallman, and the court. Good afternoon, your honor. Deputy Federal Public Defender Michael Parente on behalf of the petitioner William Charles Payton. We're here on Mr. Payton's motion for a certificate of appealability following the district court's denial of his motion for fraud on the court. The district court's decision made at least three errors debatable among jurists of reason. First, the district court erred in failing to apply the recklessness standard. Now, respondents' opposition brief to the COA acknowledged that the Sixth Circuit has in fact adopted a standard that encompasses recklessness for fraud on the court. The district court did not adopt that standard. Mr. Parente, before we get that far, can you explain to me the distinction that you're trying to make in our case law with regard to Rule 60B, which we have held requires a certificate of appealability, and Rule 60D, when both of those rules address fraud or misconduct by the opposing party as the basis to reopen a judgment? Well, I think there is a significant distinction there, and that is an alternative argument that we make, that no certificate of appealability is required because Rule 60D-3 is distinct. The reason for that is that in the context... But how is it distinct? That's what I'm having a hard time understanding. Yes, so the reason it's distinct is because in the context of fraud on the court, you never have to reach the merits. It's a unique situation because the petitioner appellant can ultimately prevail without the court ever reaching the merits. In a 60B context, you're always reopening the judgment ultimately to get somewhere, presumably the merits of the case. But they both address situations where the integrity of the underlying proceeding that led to the judgment is questioned because of the conduct of the opposing party. And I'm really struggling trying to understand the distinction that you're making here because I just don't see it. Well, because the fraud on the court context is really uniquely determined, did these proceedings have the integrity that's required? Was the integrity of the proceeding in question, as opposed to in a Rule 60B context, where I agree there's some overlap. I acknowledge that there's some overlap between what might be brought under the rules. But there's plenty that's brought under Rule 60B that certainly would not fall under Rule 60D. And I think once you're in the Rule 60D realm, now you're narrowly focused. You're narrowly focused just on fraud on the court. So unlike Rule 60B-3, where you can raise a Rule 60B-3 motion just based on misrepresentations that another party gave you, and ultimately based on those misrepresentations, you'll be asking the court to adjust its merits determination or to get to the merits. So is the relief that you're seeking here essentially to set aside the judgment of death as a penalty for misconduct by the opposing side? Is that the relief that you're asking for? That is one of the remedies that we suggested. We did also suggest, however, that the court could, if it granted the COA, obviously here we're just requesting a COA, but if the court granted the COA, it could also remand for an evidentiary hearing for us. But why would we do that when it is now law of the case that the testimony of these quote-unquote jailhouse informants wouldn't have made a difference in the underlying determination by the jury, A, that he was guilty of the crimes, and B, that there were sufficient aggravating circumstances to warrant the death penalty? Well, this Court and the Supreme Court, starting with Hazel Atlas, has said that fraud on the court is a miscarriage of justice. So when you're alleging fraud on the court, you are alleging that there's been a miscarriage of justice. And the Supreme Court has said in Dobbs v. Zant that a miscarriage of justice is itself an exception to law of the case. So is your argument that it's just pure structural error, that we don't look to the harmfulness of the the testimony that you're challenging? I'm not sure that I would, I'm not making a claim of structural error in the traditional sense. I think it is analogous to structural error, that you're claiming there's a structural error in the proceedings when a fraud on the court motion. So I do think that there's an analogy there. But I'm not claiming that this is somehow a new constitutional claim that is structural error under the Constitution. Well, the problem I've got is it's not really a new claim at all. I mean, we have examined exhaustively, this is what now the fourth round of appeals to the Ninth Circuit, at least two, I think three. I've only been involved, I think, in two of the three. But the issue of the reliability of the informant, the jailhouse informant testimony and the weight that that testimony was to be given has been exhaustively litigated and you've lost before every court that you've raised the argument. Why can we now revisit what we have previously said wouldn't have mattered to the ultimate outcome in the case? Well, this is different. I do want to start off by saying that those two prior appeals, if we're kind of getting to substantial showing of a constitutional right under the COA standard, if we're there, they said that there was insufficient evidence of a messiah violation. In both of those prior appeals, that was the basis for at least the messiah claim. It was we don't have enough evidence. But wouldn't the remedy for a messiah claim be the same to exclude the evidence that was obtained through the messiah violation? Yes, and that's the critical difference because when the court analyzed prejudice from, say, the Brady, the Brady claim, it was doing just that. It was saying further information related to the informant Escalera, who were focused on here for the penalty phase, that that would not have made a difference in his, that would not have changed the outcome as an impeachment. In essence, what it seems to me that what the courts were saying, and I think we've said it as well, is that there was no miscarriage of justice here. That the defendant was convicted on very, very strong, if not overwhelming evidence, and the nature and heinousness of the crime were sufficient to warrant the aggravating circumstances that resulted in the verdict of death. And I think on that point there are some terms of art here that need to be distinguished too, because miscarriage of justice is used in the habeas context in another, in another context where you're arguing actual innocence or something along those lines. And we're not arguing that the miscarriage of justice here is in the way that the miscarriage of justice is typically used in a habeas proceeding. We're arguing that the miscarriage of justice is the fraud on the court, because that is what Hazel Atlas, and if there's fraud on the court, that fraud is a miscarriage of justice itself. But doesn't the fraud have to be material to the outcome of the case? Again, I'm back to the same problem that started my questioning. Well, it doesn't have to be material in the sense of prejudice. Now, I agree it has to be material and that it has to go to a material fact, something that was... Counsel, Judge Gould, can I interject a question here on the point you're arguing right now? Isn't there a legal authority from the Supreme Court or our court saying a messiah violation that interfered with counsel rights under the Sixth Amendment is reviewed for harmless, can be reviewed for harmless error? Yes, so in messiah... Okay, so if that's the case, and then if there's overwhelming evidence of appellant's guilt, because there are eyewitnesses against him and some physical evidence, then why would it, why would the so-called fraud on the court that you claim, why would that be material to the decision? Well, those prior decisions, as to the messiah claim, there's no prior decision of this court saying that there's no prejudice in this case if Escalera doesn't testify at all. Escalera is the penalty phase informant. Escalera was one of only two penalty phase witnesses. The only other penalty phase witness in this case was Mr. Payton's ex-girlfriend. He had consensual sex with her, she testified, and then there was, there was an attack. And I acknowledge that, but I don't think that that one witness of the ex-girlfriend, who's not testifying to actually what happened in his commitment offense, where, you know, it's a rape murder, that based on the ex-girlfriend's testimony alone, that would have been sufficient for a death verdict, at least it's reasonably debatable. But Mr. Parente, you're overlooking the significant evidence of the crime itself, which the death penalty jury was certainly well acquainted with, which strongly corroborated what the ex-girlfriend had to say about Mr. Payton's relations with women. Escalera's comments in the penalty case, his testimony, not his comments, go much farther than just saying that he had a problem with women. He's saying that Mr. Payton had this inherent urge to rape and kill all women, regardless of age or looks. Well, we've got three female victims and at that time, the 10-year-old son, do we not? I mean, how many do we have, does the jury have to have before they start concluding that we're seeing a pattern here? And all of that goes to his, the judgment of the death penalty, I understand. But the California Supreme Court, when it, there was two dissenting judges on the California Supreme Court when they heard this evidence, and they said, although the crimes defendant committed were heinous, they were not of such magnitude as to make a death verdict a foregone conclusion. That's from his direct appeal to California Supreme Court judges. So there's at least two judges that saw, that already saw prejudice in this case. But that gets back to my point. I mean, you know, then we had appeals through the habeas to the Ninth Circuit and went to the Supreme Court and those, nobody has questioned the reliability of the evidence of his guilt, as Judge Kould points out. And I mean, I just, I'm having a hard time seeing why this makes any difference to the ultimate outcome, both of the guilt phase and the penalty phase. Well, it makes a difference because we're alleging that the federal habeas proceeding here was tainted by a I think it affects more than just Mr. Payton's case. I think it affects the perception of the integrity of a federal habeas review. I think it's a foundational claim to attack the integrity of the proceeding. And I understand that it is a serious claim, but we have the evidence here to, to support it. You know, we have a sworn declaration denying any preferential treatment whatsoever to Escalera. We have a deposition testimony from the prosecutor. But didn't the jury hear a great deal of cross-examination with regard to, was it Escalera that got a walk on 300 burglaries? That was Garcia. Garcia. But Escalera got a very favorable disposition. Actually, Your Honor, the jurors did not hear about Escalera's favorable, about his true favorable disposition. But wasn't he cross-examined on the fact that he'd cooperated for years with various law enforcement agencies in Los Angeles? They knew that he had cooperated. They knew that he was hoping for a sentence of one to seven years, and that's very different than what he got. And they also thought that he was just hoping for it, that there was no deal in exchange for his testimony. He was just there out of the goodness of his heart and also knew that the testimony would be brought before the sentencing judge. And he understood that based on that, he would get a sentence of one to seven years. So are you saying that the jury didn't know that he was trying to better his legal situation by testifying? It's a vast, it's a vast difference. One to seven years and straight release on probation signed by the same prosecutor who's there prosecuting Paton's case. That's a vast difference. But also, it doesn't get at all to what if he hadn't testified at all? Because that's the true prejudice analysis here. If you, I think if you want to look at our strongest position, then the fact that his testimony could have been excluded altogether, that never got evaluated. And there you only have one penalty phase witness left. That's the ex-girlfriend. And then you have a wealth of evidence that Paton brings about his good behavior in prison, his religious conversion, you know, eight people testifying to the work. And I think that jurors reasonably, at least reasonable jurors could debate that that was prejudicial to Mr. Paton, if he had had a fair proceeding with that evidence considered. Counsel, what about the fact that we're dealing with a crime that occurred 40 years ago? I mean, the Supreme Court has constantly reminded us that there has to be some finality to these cases. And I mean, this case is, I think it's the oldest case that I have with regard to when the crime was committed. I mean, at what point do we say enough is enough here? Well, I think when we're confident in the integrity of the proceedings that have occurred in the review, and that would be enough. But because we're not confident in that here, we can't say it's enough in this case. And also, the Orange County informant program has changed, fundamentally changed the picture of, I think, how we can look at this case. Because the pattern or practice that came out of Decry, it just matches exactly what was happening. But there was no evidence that that actually existed at the time, is there? I mean, Decry, at best, as I read the Superior Court ruling, said that it may have been in existence for 10 years. But that was in 2014. So this crime was committed in 1980. Eighty. Eighty. So you've got a big gap there where there's just no evidence. And I understand that we're not making the argument that directly out of Decry comes evidence tying in Payton. But the pattern or practice is undeniable. You look at the way that the informants were. This is Escalera, for example. He's on a traffic matter. He's placed right next to Payton, even though, as Your Honor said, he had been an experienced informant that entire time. And then on the other side, you have Garcia, again, placed right next to Payton. When Escalera is placed on probation, he's arrested again. And he's brought right again back to Escalera. And I think it's fair. Counsel, this all has been sorted out before and argued, correct, on the informants and why they weren't believable or credible? It seems like we're just rehashing. We had no systemic problem to point to. We had no way to know that this was the systemic type of violation that was happening. And so that was it was never argued as a system. But the actual evidence challenging the credibility of these informants was without the systemic evidence has already been presented on multiple occasions. There was a precedent. There was a messiah claim. I understand that there was a messiah claim. It did not have any of this evidence, which we argue was intentionally suppressed by the prosecutor in order to alter the result of the federal habeas proceeding. If the prosecutor, if this evidence had been in its complete form when this court first heard the appeal, it's a completely different picture. You're asking us to extrapolate backwards or based on a pattern of conduct that the decry court found existed in 2014. And you want us to extrapolate back to 1980 and say, well, if they were doing that in 2014 under this TREC program or whatever it was called, then they must have been doing it in 1980. And we think that because the connections are there, because our evidence does, in fact, show that the prosecutor is lying about one of the informants at least, and that there's these movements that match what happened in Decry, that we're at least entitled to what Decry had, at least a part of what... A 24-year gap in proof? It's a decade-long discovery violation that's coming out of Decry. Right, but that only gets you back to 2004. And the problem I'm having is then you want to back up another 24 years to 1980. And I just, as Judge Rawlinson said, I mean, we've been over these, the impeachment stuff time and time again, and nobody has responded to your arguments that it would have made a difference. And I think that's why we need discovery power. I mean, in habeas, our hands are tied. We don't have the power to really dig into this and give the court the full picture without discovery power. And I understand discovery is reviewed for abuse of discretion. But in this case, the discovery was zero. And our plan is... Well, the district court said it wasn't relevant. And I can understand why, because of this big gap. Well, the district court made several errors in concluding that it was not relevant. The district court concluded that Decry, for example, was isolated to a single case, that that's all, that the ruling was isolated. Well, didn't the superior court judge say, I'm not making a systemic ruling here. I'm simply saying that the conduct by the Orange County Sheriff and the district attorney in this case. In terms of the punishment that he needed out, it was, of course, just related to that case. And he was careful to narrow his holdings. But you want us to extend his ruling beyond what the superior court judge was willing to say. No, just to honor his factual finding. He made a factual finding that there was, in fact, a well-established informant program operating in the Orange County Jail. For at least a decade back from 2014. For at least a decade. I'll reserve the rest of my time for Buttle. Thank you. Good afternoon. And may it please the court. Natasha Cortina, supervising deputy attorney general for the state of California. The fact that the federal courts, including this court, have previously found that the Messiah and Brady claims do not warrant federal habeas relief. Answer the two questions posed by Payton's application for a certificate of appealability. Does he need one, and can he get one? Yes, he needs one, and no, he cannot get one. He needs one because it is to revive the Brady Act through the Rule 60D motion is an attack on the merits. And therefore, it subjects him to the limitations on federal habeas review under the AEDPA. Now, my friend has asked this court to view an attack under Rule 60D, the integrity of the proceedings, as somehow distinct from any other Rule 60 motion. But the Supreme Court made clear in Gonzales that Rule 60 is to be construed consistent with the AEDPA and its limitations on federal habeas review. So what we need to look at is the nature. The other thing that the Supreme Court said in Gonzales is it's not the label of the application, but it's the nature of the claim or the assertion in it. And in this case, Payton is directly challenging the district court's ruling on the merits, not only in general for the judgment, but specifically regarding the Brady and the Messiah claims. And therefore, he is subjected to the AEDPA's requirements for a certificate of appealability for the very reasons that this court, as it's previously held in the context of a Rule B6, for finality, to prevent frivolous appeals from clogging the docket, and to stop forcing the state to repeatedly defend its judgment. In the state court, the same policy considerations apply equally to a Rule D context. And it would be illogical for a petitioner from a habeas proceedings to have to obtain a COA in the context of a federal habeas determination, and then circumvent that requirement simply because they're trying to seek to reopen that same judgment through labeling their document a Rule 60D. And if the court has no questions on whether a certificate of appealability is required, I'll turn to... I have one question, counsel. Yes. My question is this. Putting aside the logic of it, am I correct that no federal circuit court, not ours or any other, has yet ruled on whether a 60D3 claim requires a COA? I did not uncover a case that specifically dealt with Rule 60D3. However, the same principles and the Supreme Court's decision in Gonzales didn't distinguish between the particular subdivisions. Right. So if we were to decide in your favor on that, am I correct that there should be an opinion written? Yes. I think that there should be an opinion to clarify what should be a natural conclusion of the court's other decisions in the context of the Rule 60D context. And that would be helpful, and it would be completely appropriate to do it in this proceeding. The fact that whether a COA is required in a Rule 60D proceeding does not, as my counsel has suggested, justify a reason for advancing the appeal. It is something that can be decided in this context, in this proceeding, and an opinion would be, in fact, helpful. Okay. Thank you. So with respect to whether Peyton meets the requirements for a COA, there's two prongs that the Supreme Court said must exist in the context of a Rule 60 motion appealing from a federal habeas proceeding. And that is one, the procedural one, whether the district court abused its discretion in denying the Rule 60D motion, and the other is whether there's a debatable constitutional violation. Now, Peyton cannot meet either, but I'll start with the prong about the substantive one of whether Peyton can establish a debatable constitutional violation. And he simply cannot do so. As this Court's questions indicated, every court that has examined these issues has determined that the outcome of his guilt and penalty phase would be unaffected by any impropriety concerning the use of informants in Peyton's trial. Do you concede that there was impropriety in using the informants? I do not make that concession at all. Peyton has not established with clear and convincing evidence that there was any Messiah or Brady violations in this case. And the Court, importantly, in deciding those claims in the federal habeas, actually had the virtually identical evidence that Peyton is presenting now to substantiate his accusations and did not find that evidence demonstrated that the prosecutor has committed either a Brady or a Messiah violation. So, going back to the second prong, which defeats the certificate of appealability, is whether Peyton can establish a debatable constitutional violation. And given that the courts have at every instance determined that it would not affect the outcome, Peyton's attempt to bootstrap the improper conduct that is arising out of the decry proceedings in no way alters that conclusion. You know, as the District Court found when reconsidering Peyton's claim for the seventh time up and down the federal proceedings, that no quantum of evidence relating to the use of jailhouse informants would be sufficient to overcome the highly damning evidence of guilt and supporting the penalty phase in this case. Now, my friend focuses on the procedural prong about whether the District Court abused its discretion in denying the Rule 60D motion. And for good reason, because the resolution of the first prong precludes an issuance of a warrant of a COA. And so, although not debatable, the District Court's decision concerning the exercise, the District Court's decision denying the Rule 60D motion, it would not give rise to a COA on behalf of Peyton because there is no, it doesn't lead to a debatable constitutional violation. With respect to the decision itself, the procedural one, whether the court abused its discretion, I think I'd fully brief that in our pleadings, and unless the court has any questions on that issue, I will submit on that particular claim. So I'll end with, as Judge Tolman has said, that enough is enough. The time is now. Peyton has had countless opportunities and evaluations of his claims of Brady and Messiah violation, and every court that has passed on it has determined that it would not alter the outcome. Well, Counsel, he didn't have the, as he phrases it, the evidence of the systemic violations of defendants' rights. What's your response to that? That it would be of no consequence, given the determination, that it would not affect the outcome. So even if he had had more evidence that undermined or eliminated the credibility of the jailhouse informants, the cases against Peyton for the guilt and the penalty are overwhelming and pretty independent of the informant evidence. One last thing. I know I had said enough is enough. But what I wanted to mention was that the final constraint to obtaining a COA, and which we advanced below and the district attorney touched upon, is that ultimately his claim is a successive petition, and he should be required, as the Supreme Court has said, to follow the structure and the limitations on review that are set forth in the AEDPA. And because of that, he should have obtained an authorization to file a successive petition. And in that avenue, Peyton would have been able to provide the additional evidence he claims that he has been deprived of providing to this court. And in that regard, his suggestion that there's no other avenue or there should be discovery is completely unfounded. And with that, I'll submit. All right. Thank you, counsel. Thank you. Rebuttal. As to the issue of whether this is consistent with AEDPA, there's no inconsistency here. made clear that AEDPA retained all of the traditional common law equitable doctrines, such as equitable tolling, and fraud on the court would fall within that domain. But the other thing that I think AEDPA clarifies that is important here, it's the importance of the first federal habeas proceeding. AEDPA directs everything to that first federal habeas proceeding, and that's the proceeding that we're alleging was tainted. And when that first proceeding is tainted, it affects everything else, all of the proceedings, all the appeals after that are tainted when the first AEDPA proceeding is tainted. But if the argument is that there has been egregious misconduct by the state here in the manner in which it introduced the testimony of the jailhouse informants, doesn't the taint still require some showing of prejudice? It sounds to me like what you're asking us to do is to deprive the state of the right to impose the death penalty as a sanction for the egregious behavior. And that goes beyond a question of tainting the reliability of the jailhouse informants. Isn't that what you're asking us to do? Yes. And they would have had the ability to meet all of this evidence had it all been fairly presented in the first habeas proceeding, had it not been hidden from the court in the first proceeding, they would have had their fair shot. But what does that do to the debatable constitutional claim where one of the prongs is, well, there are two prongs. First, you have to show the constitutional violation, which you allege is Brady and Messiah. And secondly, you have to show prejudice. And I think that's where it's really important for the court to go back and look at the Messiah violation, because it will not find an opinion from any court saying that you exclude Escalera's testimony altogether and there's no prejudice. You won't find that. You'll only find that, oh, we don't have enough evidence yet for the Messiah. But even the superior court in Decry imposed only that level of exclusion, did it not, as a sanction for the violation, that it deprived the state of the right to use the jailhouse informant testimony in Decry's trial or penalty? Initially, yes, Your Honor, initially. But the ultimate sanction was to strike the death penalty. And we augmented the record with that before the district court entered judgment. Okay. Because this issue is debatable, we ask that you grant Peyton's motion. Thank you. All right. Thank you. Thank you to both counsel. The case, as argued, is submitted for decision by the court. We are in recess.
judges: Gould, Tallman, Rawlinson